UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| SHELBY EAGEN and JEFFERY LAFOUNTAIN, individually and as surviving parents of L.L., deceased,   )<br>)<br>)<br>)<br>Plaintiffs,   )<br>)<br>v.   )<br>)<br>KIRKSVILLE MISSOURI HOSPITAL )<br>COMPANY, LLC, and   )<br>UNITED STATES OF AMERICA,   )<br>)<br>Defendants.   ) | Case No. 2:20-CV-56-SPM |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs' Motion for Leave to Amend in Order to Add Punitive Damages Claims (Doc. 25) and Plaintiffs' Supplemental Motion for Leave to Amend in Order to Add Punitive Damages Claims (Doc. 31). Defendant Kirksville Missouri Hospital Company, LLC, d/b/a Northeast Regional Medical Center ("Northeast Regional" or "Defendant") has filed a memorandum in opposition (Doc. 34), and the time for Plaintiffs to file a reply has expired. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 15). For the following reasons, the motions will be denied.

**I.    BACKGROUND**

On September 23, 2020, Plaintiffs filed their original Complaint in this Court against two defendants: Northeast Regional and the United States of America. (Doc. 1). Plaintiffs alleged medical malpractice claims against both defendants, but Plaintiffs did not seek punitive damages.

Plaintiffs subsequently filed a Motion for Leave to Amend in Order to Add Punitive Damages, along with a proposed first amended complaint adding claims for punitive damages against both defendants. (Doc. 25). Plaintiffs then filed a Supplemental Motion for Leave to Amend in Order to Add Punitive Damages Complaint, along with a new proposed first amended complaint that removed any claims for damages for punitive damages against the United States, due to the statutory preclusion against such damages. (Doc. 31). In light of the supplemental motion, the Court will deny the initial motion as moot and will consider only the allegations in the new proposed first amended complaint. However, the Court will consider the arguments in the original motion to the extent that they apply to the supplemental motion.

In the proposed first amended complaint, Plaintiffs allege the following. On October 7, 2019, at about 7:30 a.m., Plaintiff Shelby Eagen, then 40.2 weeks pregnant, was admitted to Northeast Regional under the care of her obstetrician Melodie Stocks, D.O. ("Dr. Stocks"), for the purpose of induction of labor. Proposed First Amended Complaint ("PFAC"), Doc. 31-1, ¶¶ 3, 13. While at Northeast Regional, Eagen was also treated by Nurse Cymber Coin ("Nurse Coin"), who worked under the direction of Dr. Stocks. *Id.* at ¶ 17. Dr. Stocks ordered that Eagan be given an increasing dosage of Pitocin throughout the day. *Id.* at ¶ 15. Pitocin is considered a "high alert" drug and can lead to fetal distress if mismanaged. *Id.* At about 11:00 a.m., Dr. Stocks performed an artificial rupture of membranes, which revealed the presence of meconium in the amniotic fluid. *Id.* at ¶ 16. An IUPC [intrauterine pressure catheter] was placed, but not a fetal scalp electrode. *Id.* By 8:00 PM, the fetal monitoring revealed warning signs of fetal distress—Category II fetal heart tracing. *Id.* at ¶ 17. Nevertheless, Nurse Coin, at the direction of Dr. Stocks, did not decrease or stop Pitocin as the standard of care required, but continued to increase it. *Id.* By 10:11 p.m., Eagan began pushing in the second stage of labor; a fetal scalp electrode still had not been placed. *Id.* at ¶ 18.

By 10:36 p.m., evidence of fetal tachycardia, a warning sign of fetal hypoxia, was present. *Id.* at ¶ 19. By 11:39 p.m., the fetal monitor revealed Category III fetal heart tracing, meaning that L.L. was in fetal distress and needed to be delivered emergently. *Id.* at ¶ 20. Despite knowing that warning signs existed of fetal distress from hypoxia, Dr. Stocks chose to continue the Pitocin after briefly stopping it at 9:23 p.m. *Id.* at ¶ 21. Pitocin was administered from 9:53 p.m. through 12:50 a.m. on October 8, at which time clear evidence was known to both Nurse Coin and Dr. Stocks that L.L. was at risk for brain injury from hypoxia. *Id.* at ¶ 21. By 12:50 AM, fetal heart strips revealed fetal tachycardia, an absence of variability, and no accelerations, and an emergency caesarean section was required. *Id.* at ¶ 22. However, Dr. Stocks did not call for the caesarean section until 1:03 a.m. and did not deliver L.L until 1:59 a.m. *Id.* at ¶ 22. In addition, despite knowing that L.L was experiencing fetal distress, Dr. Stocks called for a "level two" caesarean section, meaning that no emergency or STAT caesarean would take place; this further delayed the delivery. *Id.* at ¶ 23. During the hours that passed from 11:39 p.m. to 1:59 a.m., L.L. had evidence of fetal hypoxia that was known to both Dr. Stocks and Nurse Coin. When L.L. was finally delivered, thick meconium was found; L.L. was found to have suffered severe hypoxic ischemic encephalopathy and a lack of brain activity. *Id.* at ¶ 25. L.L. died on October 12, 2019. *Id.* at ¶ 26.

Plaintiffs assert one count of medical malpractice/wrongful death against Defendant Northeast Regional and one count of medical malpractice/wrongful death against Defendant United States of America.[1] In the claim against Defendant Northeast Regional, Plaintiffs allege that Nurse Coin, an employee of Northeast Regional, committed a series of acts and omissions that led to the death of L.L.: (a) Nurse Coin failed to properly monitor, assess, and document L.L's

---

[1] The claim against Defendant Northeast Regional appears to be based primarily on the actions of Nurse Coin; the allegations against Defendant United States of America appear to be based primarily on the actions of Dr. Stocks. *See generally* PFAC.

fetal heart monitoring and Shelby Eagen's contractions, which clearly showed fetal intolerance and a deteriorating fetal status; (b) Nurse Coin filed to provide competent and safe analysis of fetal heart rate patterns; (c) Nurse Coin failed to request a fetal scalp electrode be placed to more accurately and continuously provide reliable information regarding L.L's heart rate; (d) Nurse Coin chose not to communicate timely and adequately with Dr. Stocks or go up the chain of command about the fetal intolerance of labor; (e) Nurse Coin knowingly chose not to question the order of Pitocin, despite knowing that it was being administered at unsafe levels or at levels that were causing fetal distress and uterine over stimulation; (f) Nurse Coin chose not to question verbal orders to increase or restart Pitocin when it was contraindicated and when she knew that the baby could be experiencing oxygen deprivation; (g) Nurse Coin administered Pitocin when it was contraindicated in the face of persistent Category II and ominous Category III tracings, despite knowing that it could cause harm to the baby; (h) Nurse Coin failed to follow appropriate hospital policies, protocols and procedures governing the administration of Pitocin; (i) Nurse Coin failed to follow doctor orders for stopping Pitocin if a non-reassuring fetal heart rate were occurring; (j) Nurse Coin chose not to advocate for her patients, or to follow the chain of command when Dr. Stocks instructed her to continue or increase Pitocin when it was dangerous to do so; (k) Nurse Coin failed to provide intrauterine resuscitation measures which specifically included not administering Pitocin; (l) Nurse Coin knew that it was unsafe to continue to provide Pitocin in the face of persistent Category II and ominous Category III tracings and knew that L.L. could be in fetal distress from hypoxia, yet recklessly continued to follow Dr. Stocks's instructions when she knew it could be harming L.L. to do so; and (m) Nurse Coin chose not to advocate for her patients that they needed an emergency cesarean section performed, despite knowing that L.L. was in fetal distress. PFAC ¶ 29. Plaintiffs further allege that Nurse Coin's "choices and actions . . . [were]

willful, wanton and/or . . . made with intent to do a wrongful act without just cause or excuse." *Id.* at ¶ 30. Plaintiffs seek actual and compensatory damages and "aggravating or punitive damages to punish and deter similar conduct in the future." *Id.* at ¶ 33.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[D]enial of leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the non-moving party can be demonstrated." *Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (quoting *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001)). The futility exception applies "if the amended claim 'could not withstand a motion to dismiss under Rule 12(b)(6)'" for failure to state a claim upon which relief can be granted. *Id.* (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 719 (8th Cir. 2014)). In other words, if the amended claim would inevitably be dismissed, the Court must deny leave to assert the amended claim in the first place. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action . . . do not suffice." *Id.*

## III. DISCUSSION

In support of their motion for leave, Plaintiffs argue that their allegations are similar in nature to those the Missouri Supreme Court found adequate to support a claim for punitive damages against a health care provider in *Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d

469 (Mo. 2021). They argue that because the defendants in this case recklessly and knowingly ignored clear warning signs that L.L. was receiving insufficient oxygenation yet did not take steps to deliver L.L., the requirements for a finding of punitive damages are met.

In its opposition, Defendant Northeast Regional argues that Plaintiff's reliance on *Rhoden* is misplaced because in that case, the Missouri Supreme Court was applying a prior version of the Missouri statute governing punitive damages, Mo. Rev. Stat. § 538.210 (2017), that does not apply to this action.[2] Defendant argues that the instant case is governed by a new version of the statute, enacted in 2020, which permits an award of punitive damages against a health care provider only upon a finding that "the health care provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct that caused damage to the plaintiff" and which provides that "evidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct." Mo. Rev. Stat. § 538.210.8, amended in 2020 by Senate Bill 591. Defendant argues that Plaintiffs have not alleged facts sufficient to satisfy the 2020 version of the statute, and therefore the proposed amendment would be futile. In the alternative, Defendant argues that Plaintiffs have not alleged facts sufficient to satisfy even the 2017 version of the statute. Plaintiffs had the opportunity to file a reply to address those arguments but did not do so.

As a threshold matter, the Court must address which version of Mo. Rev. Stat. § 538.201.8 applies to this case—the 2017 version or the 2020 version. Plaintiffs provide the Court with no argument on this point. As Defendant notes, Senate Bill 591 explicitly provides that its provisions

---

[2] That version of the statute provided that "an award of punitive damages against a health care provider governed by the provisions of sections 538.205 to 538.2302 shall be made only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition." Mo. Rev. Stat. § 538.201.8 (2017).

"apply to causes of action filed on or after August 28, 2020," and this case was filed on September 23, 2020. As Defendant also notes, although Missouri courts have found that the Missouri Constitution precludes the retrospective application (to causes of action that accrued prior to the effective date) of statutory provisions that limit *compensatory* damages,[3] the Missouri Supreme Court has held that retrospective application of a limitation on punitive damages is permissible. *See Vaughan v. Taft Broad. Co.*, 708 S.W.2d 656, 660 (Mo. 1986) (holding that an amended statute eliminating punitive damages applied retrospectively; reasoning that the Missouri Constitution's general bar on retrospective operation of statutes "does not apply . . . to a statute dealing only with procedure or remedies," that "[p]unitive damages are never allowable as a matter of right and their award lies wholly within the discretion of the trier of fact," and that "punitive damages are remedial and a plaintiff has no vested right to such damages prior to the entry of judgment."). *Cf. Dixson v. Missouri Dep't of Corr.*, 586 S.W.3d 816, 826 (Mo. Ct. App. 2019) (noting that "based on *Vaughan*, a cap on punitive damages is remedial and can be retroactively applied to actions that accrued before its effective date" but holding that a statute that capped the total amount of actual and punitive damages must be interpreted to apply only prospectively). Based on *Vaughan*, the Court concludes that the new version of the statute limiting the circumstances under which punitive damages are available applies retrospectively to the acts giving rise to this case.

---

[3] *See, e.g.*, *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 758 (Mo. 2010) (holding that the application of a new statutory cap on noneconomic damages "to causes of action that accrued before the effective date of the law violates the constitutional prohibition of retrospective laws.") (citing Mo. Const. art. I, § 13); *Dixson v. Missouri Dep't of Corr.*, 586 S.W.3d 816, 826 (Mo. Ct. App. 2019) ("[U]nder *Klotz*, a cap on actual damages is substantive and cannot be retroactively applied to actions that accrued before its effective date. Because the damages cap in Section 213.111.4 has the effect of limiting the total damages that a plaintiff may recover, including compensatory damages, under *Klotz*, the cap on the total amount of actual and punitive damages must be interpreted to apply only prospectively to actions that accrued on or after its effective date of August 28, 2017.)

The Court next turns to the question of whether the allegations in the proposed first amended complaint satisfy the requirements in the 2020 version of the statute. That statute provides, in relevant part:

> [A]n award of punitive damages against a health care provider . . . shall be made only upon a finding . . . that the health care provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct that caused damage to the plaintiff. Evidence of negligence including, but not limited to, indifference to or conscious disregard for the safety of others shall not constitute intentional conduct or malicious misconduct.

Mo. Rev. Stat. § 538.210.8 (2020).

Plaintiffs' allegations do not satisfy this very high standard. At most, the allegations in the proposed amended complaint suggest that Nurse Coin and/or Dr. Stocks exhibited a conscious disregard for the safety of to L.L.—something that the Missouri legislature has expressly stated does *not* constitute "intentional conduct or malicious misconduct" for purposes of the newly amended statute. For example, Plaintiffs' allegation that "Nurse Coin administered Pitocin when it was contraindicated in the face of persistent Category II and ominous Category III tracings, despite knowing that it could cause harm to the baby," PFAC ¶ 29(g), suggests only that Nurse Coin was conscious of a risk to L.L.'s safety but disregarded that risk; it does not suggest that she intentionally caused damage to L.L. or that she engaged in malicious misconduct. The other factual allegations, similarly, suggest negligence, recklessness, or conscious disregard for safety, but not malicious misconduct or intentionally caused damage. Additionally, Plaintiffs' conclusory allegation that Nurse Coin's choices and actions were "willful, wanton and/or . . . made with intent to do a wrongful act without just cause or excuse," PFAC ¶ 30, is not sufficient to plausibly suggest an entitlement to punitive damages under Rule 12(b)(6). Such conclusory assertions are "not entitled to the assumption of truth" and must be examined in light of their "factual context." *See Iqbal*. 556 U.S.

at 680-81, 686. The factual context makes it clear that Plaintiffs have not stated a claim for punitive damages.

Because Plaintiffs have not plausibly stated a claim for punitive damages under the 2020 version of Mo. Rev. Stat. § 538.210.8, the proposed amendment would be futile. The Court will therefore deny Plaintiffs' motion for leave to amend.

### IV.   CONCLUSION

For all of the above reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Supplemental Motion for Leave to Amend (Doc. 31) is **DENIED**, without prejudice.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to Amend (Doc. 25) is **DENIED** as moot.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of October, 2021.